Filed 2/11/21  M.D. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| M.D., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, <br><br> Respondent; <br><br> SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Real Party in Interest. | E076249 <br><br> (Super.Ct.No. J282487) <br><br> OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Christopher B. Marshall, Judge. Petition denied.

Friedman & Cazares and M. Teri Lim for Petitioner.

No appearance for Respondent.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Real Party in Interest.

1

M.D. (mother) filed this petition for extraordinary writ after the juvenile court set a hearing to terminate her parental rights. Mother and father, who is not a party to the writ, have one daughter, A.V. She was five months old when the juvenile court took jurisdiction over her and removed her from her parents' custody based on allegations of physical abuse. During the reunification period, mother was offered and participated in services for 12 months. At the 12-month review hearing (Welf. And Inst. Code, § 366.21, subd. (f)(1), unlabeled statutory citations refer to this code) the juvenile court followed the recommendations of San Bernardino County Children and Family Services (the department) by terminating services and setting a permanency planning hearing under section 366.26.

Mother challenges the order, claiming there was insufficient evidence she didn't benefit from services, that return would be detrimental to the child, and that there was no substantial probability of return. We find there is substantial evidence and deny the petition.

I

FACTS

A.    *Facts Leading to Detention*

The subject of this dependency proceeding is mother's nearly two-year-old daughter A.V. As of September 2019, A.V. was five months old. Mother and father lived apart but were in a relationship.

2

On the weekend of September 7 and 8, 2019, A.V. was with her father. On September 8, mother received a text from father saying A.V. fell off the bed while he was trying to change her. When father returned A.V. to mother on the evening of September 8, mother noticed bruises on the left and right side of the child's face. On September 10, mother noticed A.V. appeared sick and took her to the doctor. The doctor said the injuries were consistent with mother's explanation of the alleged accident, but also expressed concern about A.V.'s wellbeing.

On September 11, 2019, the department received a referral regarding suspected physical abuse. When a department social worker arrived at mother's home to investigate, she observed bruising on both sides of A.V.'s face, with noticeably more bruising on the right side. She also noticed redness in the child's eyes. The social worker took pictures and sent them to a forensic doctor, who recommended taking the child to the hospital. At the hospital the doctor asked whether either parent was left handed, given the bruising was predominantly on the right side of A.V.'s face. Mother said father was left handed, but said she didn't have any concerns about him.

The social worker then went to father's home. Father attempted to demonstrate how A.V. fell off the bed, but the social worker didn't think the re-creation was consistent with A.V.'s injuries.

The next day the doctor told the social worker A.V. " 'presented with extensive right side facial and scalp bruising . . . consistent with a hand slap injury.' " The doctor

3

expressed concern mother didn't seek immediate medical attention upon seeing the child's injuries following her return from father's care.

That evening, Ontario police arrested father for child abuse and child endangerment. The next day, a San Bernardino sheriff's deputy served a detention warrant on mother and removed A.V. from her custody.

On September 17, 2019, the department filed a section 300 petition with allegations of serious physical harm under subdivision (a), failure to protect under subdivision (b), and severe physical abuse under subdivision (e). At the detention hearing on September 18, the juvenile court ordered A.V. detained with the department.

B.     *Jurisdiction and Disposition*

The social worker interviewed mother on September 24, 2019. Mother said that father told her the alleged accident happened around 3:00 a.m. on September 8, even though he didn't tell her about it for several more hours (at around 11:00 a.m.). Father sent her a video of A.V., which she showed the social worker. According to the social worker, though the video was grainy and A.V. was far from the camera, there was still visible discoloration on her face. Mother said she was concerned when she received the video and message, but felt father was capable of taking A.V. to the doctor and A.V. seemed to otherwise be acting normally. When A.V. returned to mother's care, mother iced the bruises because she didn't think the injuries were serious enough to warrant a trip to the emergency room. Mother said A.V. was safe with her, and "if the Department wants [her] to 'remove' [A.V.] from [father] then that is what she will do."

4

Mother also admitted to a history of methamphetamine use. She said she used around 2007, starting at once a month but increasing to once a week, but said she hadn't used since 2012. She denied using any other drugs and said she drank "around a drink every three years."

On September 26, 2019, the social worker also spoke with mother's adult daughter, who was living with mother at the time of the incident. The adult daughter said that A.V. had visible bruises when father returned her to mother and that she "would be scared to even see an adult hurt like that." She also said she told mother to take A.V. to the hospital, was confused when she didn't, and thought the only explanation for why mother didn't was because she was in shock.

The same day, the department referred mother for on-demand drug testing. The test came back positive for marijuana, but mother continued to deny any drug use for the two months prior to the test.

On September 27, the department referred mother to individual counseling and parenting classes via a case plan referral. On October 2, 2019, the department received a medical report stating that A.V.'s injuries included "extensive facial bruising and bilateral subconjunctival hemorrhages," which were "not consistent with the explanation provided." The report stated the injuries were consistent with someone using force that would wrap around the child's face, such as a strike, slap, forceful pressure, or smothering. It also said A.V.'s hemorrhaging was "consistent with smothering."

The same day, the department referred mother to substance abuse counseling.

The department filed a report on October 7, 2019. The report recommended that the court bypass reunification services for both parents and set a permanency planning hearing under section 366.26 due to the seriousness of A.V.'s injuries. The department believed father caused A.V.'s injuries and that they were non-accidental. The department was also concerned that mother didn't seek immediate medical treatment for the child and denied that father injured the child or failed to seek appropriate medical care.

On October 8, 2019, the department filed an amended section 300 petition which added allegations that both parents had a history of substance abuse. Mother tested negative on two drug tests later that month. On November 5, the parents moved in together, but failed to update their new address. They did not update their address until December 4, 2019.

On November 26, 2019, the department contacted the parents' counseling center for an update. The center reported that mother attended six individual counseling sessions and five parenting education sessions. The center said her attendance was consistent and she was making good progress.

The counseling center also provided an assessment report, which noted that after the incident mother "did not see signs of injuries and did not feel the need or urgency to take daughter in for an evaluation," and only did so because she thought A.V. had a cold. The report also said mother claimed she didn't know what injuries the doctor's found. Nevertheless, the center felt mother's progress was good, and that she was "open and honest" in discussing the "history of events." It also said that mother acknowledged she

should have taken A.V. to the hospital sooner, and that she "accepted attorneys [*sic*] recommendation of ending relationship with," father. In general, the report indicated mother's prognosis was good and that she understood why the department got involved and how it impacted A.V. However, it also disclosed that mother needed to continue to work on gaining " 'insight about how abuse and neglect has impacted the child,' " that she "has a long history of maladaptive coping skills," was struggling with depression, and that it "will take a considerable amount of time to address and support" her issues.

On December 4, 2019, the department updated its report to the court just prior to the jurisdiction and disposition hearing. The department changed its position to recommending that mother be provided with reunification services, rather than bypassing services. It proposed a case plan for mother which included general counseling, parenting education, and substance abuse treatment and testing. Of the 10 objectives of this case plan, the final two were that mother show she would not let others physically abuse her child and that she would accept responsibility for her actions.

The court held a contested jurisdiction and disposition hearing on December 4, 2019. The department successfully moved to dismiss the allegations of serious physical abuse under section 300, subdivision (e). The court found all other allegations true, over mother's objection. It then formally removed A.V. from her parents, approved the department's case plan, and ordered family reunification services for both parents.

C.    *The Six-Month Review Period*

The parents had supervised visitation with A.V. once a week for two hours. Prior to the COVID-19 pandemic, both parents consistently attended these face-to-face visits. They played with, interacted with, and cared for A.V. appropriately during these visits. After the pandemic, visitation became more infrequent. For instance, while the parents called A.V. five times in April 2019, they called only once in May as of May 26, 2020, the date the report was filed. Mother said this was because of her new work schedule, as she'd started a job in late March or early April working 6:00 p.m. to 4:30 a.m. shifts.

As of May 26, 2020, neither parent had completed their case plan services. Mother missed several parenting classes and individual counseling sessions, despite these services being offered online due to COVID-19. Both parents insisted they had completed their services and didn't think they "had to do it over again." Mother felt this way despite the fact her therapist recommended additional services due to her lack of awareness about herself and her parenting issues.

Leading up to the review hearing, the department recommended the court terminate reunification services as to both parents and hold a permanency planning hearing under section 366.26. The department said the parents refused to acknowledge their responsibility for A.V.'s removal and hadn't "demonstrated any behavioral changes toward the goal of reunifying with their child." The department felt they had "failed to demonstrate any benefit from the services provided," and therefore further services wouldn't help. Overall, the department felt the prognosis for returning the child was

8

"guarded" as both parents hadn't completed their services, hadn't benefited from the services provided, missed drug testing, and had unstable housing and employment.

The court held the six-month review hearing on June 4, 2020. At the hearing both parents requested the court set the case for a contested hearing. The court set a hearing for August 19, 2020.

The department updated the court on the parents' status on August 5, 2020. By then, mother had completed her parenting classes, was compliant with on-demand drug testing, tested negative, completed eight individual counselling sessions, and started a 12-step program. The department also reported that mother "can finally accept responsibility for her daughter being injured," and knew she needed to set limits and boundaries for people watching A.V.

The department updated its prognosis for reunification to "fair." Because of this, it changed its recommendation from terminating services to providing six more months of reunification services.

On August 19, 2020, the court adopted the department's recommendations and case plan, and set a 12-month review hearing for November 10, 2020.

D.     *The 12-Month Review Period*

Between August 19 and October 21, 2020, mother completed her case plan services, which included parenting education, individual counseling, and random drug testing. The department referred her for additional services, but the processing delays due to the pandemic prevented mother from participating in these services.

9

The department filed an updated status report on October 21, 2020. In this report, the department remained concerned that mother was still not admitting her role or taking ownership of her part in the incident which led to removal. Because of this, the department's prognosis of return declined from "fair" to "guarded." In particular, the department found it troubling that neither parent had yet admitted to or disclosed what caused the child's injuries, despite social workers and doctors believing the injuries were not consistent with their story and were consistent with father physically abusing the child. Mother's refusal to acknowledge the possibility that father was responsible for A.V.'s injuries, combined with her initial refusal to take A.V. to a doctor, called into question her continued ability to protect A.V. from father or others. However, mother was working to complete her services and demonstrated benefit from these services, including new parenting skills.

Based on its concerns, the department once again recommended terminating services. The department concluded that further services were unlikely to benefit mother because she had failed to benefit from the services already provided and there "remain[ed] great concerns for the parents' ability and capacity to protect the child from any future exposure to physical and emotional abuse."

On October 27, 2020, the court continued the 12-month review hearing to December 9. The department filed an update on the parents' status on December 7. At that time mother was participating in group therapy, individual counseling, and drug testing.

10

The court held the 12-month review hearing on December 9, 2020, and heard testimony from father, mother, and the social worker. Father revealed that he and mother no longer lived together as of December 3. He said they made the decision to stop living together because someone at mother's aftercare program "recommended that we be apart until the case ends." However, according to him they were still in a relationship.

Mother said the services she had completed taught her how child abuse affects children, how it can come from those close to children, and in particular that "it's very important to seek medical attention" for any injury, and not just count on her own observations. She said she understood the seriousness of her failure to take A.V. to the hospital. She acknowledged that the department was concerned she refused to take accountability for how A.V. was injured, but when asked how A.V. was injured she still insisted it was because of a falling accident. Specifically, mother said A.V. "fell off of the bed while her dad was changing her diaper . . . [s]he hit, I believe, the toy. There was a toy at the end of the bed and the floor." Mother claimed she was "completely separated" from father. When asked whether she planned to reunify with him, she took a long pause before saying no. She later revised her answer to say that she and father were "on a break."

The social worker said she didn't think mother was taking responsibility for her role in A.V.'s injury. However, when pressed to give a specific example to support this opinion, the social worker said, "I don't really have any—much observation." The social worker also did not identify what services mother would need to complete to convince

the social worker that she was taking responsibility for her role in A.V.'s injuries. The social worker confirmed that both parents continued to deny any abuse or acknowledge that the incident was the result of abuse. When asked whether her concern for the child's safety upon reunification was based on mother and father's continued relationship, the social worker said no. She said she never advised mother to separate from father. Instead, she said she based her recommendation on the parents' capacity and ability to protect A.V., not their relationship.

The court concluded that mother's failure to accept that father physically abused A.V. was sufficient evidence neither parent had benefited from services, that returning the child to mother's custody would create a substantial risk of detriment, and that there was no substantial possibility of return. In addressing the fact that mother's therapist said mother had begun to take responsibility, the court acknowledged that mother took responsibility for not taking A.V. to the doctor, but still insisted the actual cause of the injury was an accident. The court felt that both parents "believe we're still just dealing with, basically, [an] accident[] . . . . That's not what the issue is in this case. And because there isn't a recognition on the parents' part of that significant issue, then this Court is left with the concern of the ability to protect on the part of the mother without that recognition . . . . So the absence of the recognition of that significant issue to this Court as it considers this indicates to the Court that there hasn't been a benefit from services." When addressing whether there was a substantial probability of return, the court was blunt that it "cannot make that finding when the parents don't recognize that this case

revolves around physical abuse, and not insignificant physical abuse." In addition, the court was disturbed by the parents' apparent continued relationship, even though they didn't live together any longer, because it was "satisfied that the parents cannot be in a relationship."

Accordingly, the court terminated reunification services and set a permanency planning hearing under section 366.26.

Mother filed a timely notice of intent to file a writ petition.

II

DISCUSSION

Mother raises two issues in her writ. First, she claims there is insufficient evidence to support the court's conclusion that she did not benefit from services, that return would be detrimental, and that there was no substantial probability of return. Second, she argues the case plan failed to specify critical goals to accomplish in order to be reunified with A.V., nor did it identify the means to reach those goals.

A.      *Sufficiency of the Evidence*

Mother argues there is insufficient evidence to support the court's conclusion that she failed to benefit from services, that returning A.V. posed a detriment to the child, and that there was no substantial probability of return. In particular mother claims the only evidence supporting any of these conclusions was the social worker's inchoate suspicion that mother wasn't capable of adequately protecting A.V.

13

"When the sufficiency of the evidence to support a juvenile court's finding or order is challenged on appeal, the reviewing court must determine if there is substantial evidence, contradicted or uncontradicted, that supports it." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' " (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) We review the juvenile court's finding there is no substantial probability of return and decision to terminate reunification services for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) The same is true for the juvenile court's finding of detriment. (*Georgeanne G. v. Superior Court*, at p. 864.)

Mother argues the evidence she failed to benefit from services and posed a danger to A.V. is not supported by substantial evidence because much of this evidence was, in her view, unsupported speculation from the social worker. In particular, she points out that under questioning the social worker wasn't able to articulate why she felt mother had not benefited from services. At the hearing, the social worker responded yes when asked whether the main issue "the [d]epartment had with the mother was she failed to take the

14

child to the doctor?" The social worker agreed that in mother's "therapy report, the mother takes responsibility for failing to take the child to the doctor," and further confirmed she felt that statement was accurate. The social worker also admitted that she had no recent interactions with mother and that because of this she had no evidence mother had not benefited from services. Based on this testimony, mother says the court lacked any evidence to conclude mother failed to benefit from services, that return would be detrimental, or that reunification was unlikely.

However, even accepting that the social worker's testimony was largely based on speculation and suspicion rather than concrete evidence, the record contains sufficient additional evidence to support the juvenile court's findings. The court's decision didn't turn on whether mother learned and accepted that she should have taken A.V. to the hospital. The court's concern was that she failed to learn or appreciate the root cause of the injury: namely that father likely physically abused A.V. It's entirely possible, even likely, that mother did benefit from services in that she now appreciates the necessity of immediate medical treatment for any physical trauma. But here that medical treatment was only necessary in the first place because of father's physical abuse. It is not enough that mother knows to get A.V. care for physical trauma, she must also accept, understand, and act in A.V.'s interest to prevent that trauma in the first place. Thus, the court could and did conclude that her refusal to accept father's role in A.V.'s injuries undermined any benefit she may have received in appreciating the importance of prompt medical care.

Such a conclusion is supported by substantial evidence. Indeed, its's supported by mother's own testimony. Mother testified at the hearing that A.V. was injured when "[s]he fell off of the bed while her dad was changing her diaper . . . . She hit, I believe, the toy. There was a toy at the end of the bed and the floor." Mother's own words thus confirm that she didn't believe father was at fault for A.V.'s injuries. Indeed, mother never admitted how A.V.'s injuries actually occurred or acknowledged that father's story was not consistent with the injuries. Instead she continued to insist on father's version of events and that the injuries were accidental.

Mother's reluctance or inability to acknowledge that father poses a danger to A.V. is an indication that she did not benefit from the services provided (as discussed more below) and that returning A.V. to her care would be detrimental to A.V. Mother's denial about father's role in A.V.'s injuries, her ongoing relationship with father, and her lack of transparency about the nature of that relationship, are all evidence that returning A.V. to mother would be a threat to A.V.'s well-being. First, it is evidence that mother has failed to fully benefit from the services designed to help her recognize all the threats to A.V. and work to mitigate those threats, including threats posed by other people. Second, if mother thinks the primary issue was her failure to seek medical care for A.V., doesn't believe father is a threat, and may intend to resume a relationship with him, it is highly likely that she will permit father to have unsupervised care for and custody of A.V. These are the exact circumstances which resulted in A.V.'s previous injury, and the court could reasonably conclude based on this evidence that the risk of events repeating themselves

16

was detrimental to A.V. We therefore conclude the challenged findings are supported by substantial evidence.

B.     *The Case Plan*

Turning to mother's arguments regarding her case plan, we first note that she has waived her right to argue her case plan was inadequate because she failed to timely seek appellate review of her case plan by appealing from the dispositional order. In fact, she submitted on the case plan and reunification services. "By failing to appeal, [the mother] has waived any complaint she may have regarding the plan as ordered. [Citation.] Having declined to seek appellate review of the dispositional order, and having failed to file a petition to modify the dispositional order [citation], [the mother] cannot fault [the department] for complying with it." (*In re Julie M.*(1999) 69 Cal.App.4th 41, 47.)

But even if we consider the merits of mother's claim, we disagree with her that the case plan was inadequate. Section 16501.1, subdivision (g)(2), requires that any case plan "identify specific goals and the appropriateness of the planned services in meeting those goals." "In other words, the case plan first establishes specific goals. It then must explain how the planned services prescribed for parents are related to those goals." (*In re M.R.* (2020) 48 Cal.App.5th 412, 426.) Mother argues her case plan failed to meet this requirement because it didn't identify that one goal was for mother to separate from father.

However, it is not at all clear that separating from father needed to be a specific goal, nor did the court's decision to terminate services depend on mother's continuing

relationship to father. The court found mother had failed to meet one if not two of the specific articulated goals of her case plan—namely that she "[s]how that you will not permit others to physically abuse your child," and "[s]how that you accept responsibility for your actions." In order to accomplish this goal, the case plan called for general counseling "to identify the patterns of behavior that lead up to [the department's] involvement," and "address her failure to protect [A.V.] from . . . physical abuse." Mother's continued reluctance to admit that father could have been responsible for A.V.'s injuries, up to and including in her testimony before the court, is a failure to meet this case plan objective and a sign that these counseling services didn't work. One of the case plan's specific goals was to help mother recognize that father posed a danger to A.V.—whether they were in a relationship or not—and the services provided were appropriate for helping her gain that recognition That she didn't accomplish this goal isn't an indictment of the case plan's goals or the services provided, but of mother's inability to acknowledge the reality of how A.V. was injured.

Though the court ultimately did conclude that the parents could not remain in a relationship without posing a danger to A.V., this does not appear to be the deciding factor in its decision. Ultimately the case plan goal was for mother to demonstrate that she could adequately protect A.V. Her failure to meet that goal was determinative, not her failure to terminate her relationship with father. Perhaps had she demonstrated an adequate understanding of the danger father posed, it would have been appropriate to specify that terminating the relationship was a necessary precondition to reunification.

18

But unfortunately, mother never got that far, and so not specifying that as a goal was not determinative.

## III

## DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
J.

We concur:


RAMIREZ _____
P. J.


CODRINGTON _____
J.